# EXHIBIT 1

**CLAIM FOR REFUND**

**ATTACHMENT TO FORM 1120X**

I.      PROCEDURAL STATEMENT

Steuben Foods, Inc., employer identification number 22-2407431 (the "Taxpayer"), is filing a claim for refund on this Amended U.S. Corporation Income Tax Return (Form 1120X) for the fiscal year ended July 31, 2016 (the "Amended Return") pursuant to section 6402 of the Internal Revenue Code (the "Code").  The Form 1120X demands a refund of $43,615 of tax paid to the Internal Revenue Service (the "Service"), plus interest as provided by law.  The Taxpayer submits this memorandum in support of its claim for refund.

II.      BASIS FOR THE CLAIM FOR REFUND

The Service, on audit, disallowed a deduction of $135,000 for tax year ended 7/31/2016.  This deduction was made for contributions made by Taxpayer to a Code section 501(c)(4) organization called EMPact America ("EMPact") for the periods in question.  The Service asserted that contributions to EMPact were not ordinary and necessary business expenses of Taxpayer.  The Taxpayer paid the tax the Service asserted, $43,615 for tax year ended 7/31/2016.  The Amended Return reflects the Taxpayer's disagreement with the Service's assertion that the contributions to EMPact were not allowable deductions.

III.      STATEMENT OF FACTS

Taxpayer was formed under the laws of New York State on May 11, 1981.  Taxpayer specializes in low-acid aseptic products, with a focus on dairy and plant-based beverages.  Low-acid aseptic products have a long shelf-life and typically do not require refrigeration.  From a few relatively modest production lines in the 1980's, Taxpayer has grown to have over twenty high-tech, low-acid, multi-million dollar aseptic and ESL lines.  Over $250 million in investments have been made into Taxpayer's facility by Taxpayer, public agencies, customers and suppliers.

EMPact is a not-for-profit corporation with tax exempt status under Code section 501(c)(4).  EMPact was founded in 2009 and is committed to protecting Western New York's electrical grid from the event of an electromagnetic pulse ("EMP") and preparing the public in the event an EMP were to occur.  EMPact educates the public about the risks of an EMP, which could occur either from a solar flare or nuclear weapon detonated high above the Earth's atmosphere.  A large EMP would cripple the electrical grid over a wide area, possibly for many years.

EMPact, Taxpayer, and other sponsors, regularly present events on disaster preparedness, which are attended both by the general public and Taxpayer's employees.  Notably, a large amount of products that Taxpayer produces each year are nutrient-dense dairy products which, as

a result of Taxpayer's low acid aseptic packaging technology, do not require refrigeration and have a shelf life of over one year. The targeted audiences of EMPact-related events are exactly those who purchase the products Taxpayer manufactures, and Taxpayer has received, among other things, tremendous exposure of its products and name through sponsorship of EMPact.

Taxpayer contributed $135,000 to EMPact during the period ending July 31, 2016 and deducted the same on its tax returns. Thereafter, an examining agent of the Service audited Taxpayer's returns and took the position that the amounts paid by Taxpayer to EMPact would not be deductible. The Taxpayer's representatives informed the examining agent orally and in writing that the Taxpayer did not agree with this position. Notably, Taxpayer had previously submitted letters to the IRS in connection with an IRS examination of Taxpayer's tax returns for fiscal years ending July 31, 2010 and July 31, 2011, focusing on the same issue related to the permissibility of deductions for contributions made to EMPAct by Taxpayer. Among other things, by letters dated December 16, 2013, May 7, 2014, and July 25, 2014, Taxpayer provided compelling evidence and arguments in favor of the contributions being permissible deductions.[1] By letters dated October 29, 2014 and October 30, 2014, Taxpayer also provided further compelling evidence and arguments in favor of the contributions being permissible deductions.[2] The Service issued to the Taxpayer a Form 4549-B Report of Income Tax Examination Changes where it disallowed "Other Deductions – Convention Sponsorship" of $135,000 for the tax period ended July 31, 2016.

The examining agent took no heed of this information and asserted that the Taxpayer could not deduct the contributions made to EMPact. Although the Taxpayer does not agree, it paid the additional tax owed, with interest, as a result of the disallowance of these deductions.

IV.    EXAMINING AGENT'S ANALYSIS

The agent took the position that the Taxpayer's contributions to EMPact were not ordinary and necessary in carrying on Taxpayer's trade or business. The agent referenced the following test: "[s]imilar to typical ordinary and necessary day-to-day business expenses, the deductibility under the IRC Section 162 of contributions to organizations with 501(c)(4) tax exempt status hinges on the direct relationship between the expense and the taxpayer's business, as well as the reasonableness of the expenditure."

The examining agent's conclusion that Taxpayer's contributions to EMPact were not ordinary and necessary expenses is incorrect. The agent erroneously concluded that contributions to EMPact were not directly related to the Taxpayer's dairy processing business because, *inter alia*, Taxpayer was not involved with scientific research of EMPs. However, the

---

[1] The letters dated December 16, 2013, May 7, 2014, and July 25, 2014, are attached herein as Exhibit A. The arguments and evidence presented in the attached Exhibit A made by Taxpayer and/or its representative(s) are incorporated herein by reference.

[2] The letters dated October 29, 2014 and October 30, 2014 are attached herein as Exhibit B. The arguments and evidence presented in the attached Exhibit B made by Taxpayer and/or its representative(s) are incorporated herein by reference.

agent failed to recognize that Taxpayer has been at the forefront, in its patents and production, of packaging food products that need no refrigeration and have a long shelf life, which is attractive to consumers interested in disaster preparedness. Taxpayer's aseptic processing and packaging allows nutritious low-acid products, including dairy, to last for long periods of time in the event of a power failure. Taxpayer regularly touts itself as a sponsor of disaster preparedness events put on by EMPact. Consumers interested in these events and "doomsday prepping" are well aware that these types of non-perishable, long shelf-life, products are invaluable and good for stockpiling.

By the very nature of Taxpayer's patented packaging aseptic low acid technology, and through disaster preparedness events sponsored by Taxpayer and by EMPact, Taxpayer has received tremendous exposure for its products. Taxpayer's name has been printed on promotional material associated with a number of EMPact functions. For these reasons alone Taxpayer's expenditures are directly related to the products it makes and sells. Taxpayer's involvement in EMPact is tremendous marketing for the company and generates interest in the types of products it manufactures. The targeted audiences of EMPact are exactly those who will purchase the products Taxpayer manufactures. Notably, there are other well-known food businesses who sponsor disaster preparedness events that Taxpayer and EMPact sponsor, including Wegmans and Little Caesars.

Notably, Taxpayer reaps the economic benefit of increased sales of low-acid aseptic long shelf life product whether it is the direct manufacturer of its own brand, co-manufacturer of a third-party brand, or even if third-parties manufacture these products using Taxpayer's technology. The buzz that is generated within the disaster preparedness community triggers an increase in demand and hence increased purchases of aseptic products overall. These increased sales indeed benefit Taxpayer economically, whether these increased sales are through direct consumers or indirectly through third-party producers who use Taxpayer's patented products via their brand names. The amounts contributed by Taxpayer were entirely reasonable in proportion to the benefits Taxpayer reaped.

In addition to increasing the visibility of Taxpayer's product and brand, Taxpayer's contributions to EMPact reduce the chances of an EMP damaging the electrical grid as EMPact is regularly involved in efforts to inform the public, along with utilities, of the importance of using EMP-resistant electrical equipment. As one example, EMPact previously worked with State Senator Dale Volker and Assembly Member Jane Corwin to introduce legislation that would harden the electric grid In New York State and prepare for a catastrophic EMP event. Accordingly, Taxpayer's contributions reduce risk that Taxpayer's business and production of products would be disrupted by an electrical outage caused by an EMP. Furthermore, EMPact provides Taxpayer's employees with extensive education and training, which promotes greater collaboration, sense of camaraderie and common mission amongst employees, in turn creating a more productive work force. Additionally, Taxpayer's contributions to EMPact create visibility and goodwill in the community with the government, business partners, and vendors. Taxpayer has been featured both on television and in the news regarding its association with EMPs and its contribution to disaster preparedness.

The examining agent also noted in his reasoning that the expenditures to EMPact were made on a regular monthly basis and this taints deductibility. However, this is not a valid characterization. If Taxpayer's funds were used in sponsorship of conventions or other educational activities as a sponsor, whether they are paid in installments or in one payment is not relevant if the use of those funds is related to an ordinary and necessary business purpose. For example, if a convention is planned for a later date, a sponsor can begin making payments for that purpose in advance and in any manner they see fit, as long as they are used for that purpose. If the expense itself is deductible as a matter of fact and law, it doesn't matter how and when it is disbursed in this scenario.

Taxpayer's contributions to EMPact were ordinary and necessary in carrying on Taxpayer's business. The examining agent's conclusion that Taxpayer's contributions to EMPact were not directly related to Taxpayer's business and, therefore, were not ordinary and necessary expenses is unsupported by the facts or legal authority and is clearly wrong.

## V.    APPLICABLE LAW

Code section 162 generally allows a deduction for ordinary and necessary business expenses. The deductibility of an expense is a question of fact. *See Commissioner v. Heininger,* 320 U.S. 467, 475 (1943). A deduction is ordinary if it bears a reasonably proximate relationship to the taxpayer's business. *Gill v. Commissioner,* T.C. Memo. 1994-92, *affd. without published opinion* 76 F.3d 378 (6th Cir. 1996). An expense is necessary if it is "helpful and appropriate in promoting and maintaining the taxpayer's business." *Carbine v. Commissioner,* 83 T.C. 356, 363 (1984).

With regard to advertising and event sponsorship at issue here, an activity involving the display or frequent announcement of the taxpayer's trade or business name in an environment known or reasonably expected to attract potential business contacts strongly supports the conclusion that the expenses of that activity are deductible. *See Hestnes v. Commissioner,* 47 T.C.M. 528 (1983), *affd in unpub. opin.* (7th Cir. 1985), *cert. denied,* 474 U.S. 904 (1985). A contribution to a fundraising organization is deductible as advertising (see PLR 9828031), as are a life insurance company's payments under a charitable giving program that it organized and under which it pays a specified amount to a charitable or civic organization designated by the policy owner because the company expects to receive additional sales and increased renewals from the program (see PLR 200236027).

The advertising should be directed toward those constituting the taxpayer's market or business environment. *U.S. Equip. Co. v. Commissioner,* 22 T.C.M. 1309 (1963). The cost of advertising the trade name of the taxpayer's trade or business is deductible under I.R.C. §162. *Ebner v. Commissioner,* 17 T.C.M. 550 (1958). The cost of promoting use of the taxpayer's product, through advertising and allowances, is deductible. *Rev. Rul.* 68-561, 1968-2 C.B. 117, distinguished *by Rev. Rul.* 69-331, 1969-1 C.B. 87. Specifically in the case of event sponsorship, if the sponsorship of a racing event, or an entry therein, generates publicity for the taxpayer's trade or business that is beneficial, the cost of the sponsorship is deductible under § 162. Thus, absence of any reference to

-4-

the taxpayer's trade or business at the sponsored event may preclude the deduction. *Lang Chevrolet Co. v. Commissioner,* 26 T.C.M.1054 (1967). In our case, the name of Taxpayer is ubiquitous in many pages of sponsorship materials that are disseminated in connection with EMPact events sponsored by the Taxpayer, giving tremendous exposure and name recognition in the market it serves while promoting the necessity of long-shelf life products that need no refrigeration.

Deductions have been allowed for taxpayers when the sponsorships are related to the taxpayers' businesses. *See Hestnes v. Commissioner,* 47 T.C.M. 528 (1983), *aff'd in unpub. opin.* (7th Cir. 4/11/85), *cert. denied,* 474 U.S. 904 (1985). In the case of *Hoffman v. Commissioner,* 19 T.C.M. 836 (1960), the Tax Court held that costs incurred by a manufacturer of weight lifting equipment and publisher of health magazines for taking himself, employees, and sponsored athletes to the Olympics were deductible as advertising expenses because sales were made at the games and magazine material was obtained. *Id.* at 849. Clearly the expenditures of Taxpayer via event sponsorship and other activity exposed it to a market its products serve. Similar to these above examples, the Taxpayer's contributions to EMPact was as a sponsor for various events and educational activities, which gave it name recognition and exposure for its aseptic food products to a target audience.

In the case of *Ciaravella v. Commissioner,* T.C. Memo 1998-31 (1998), the IRS allowed a taxpayer who owned a business selling and leasing airplanes to deduct the cost of his race car expenditures as an ordinary and necessary cost of his airplane business. In this case, the taxpayer raced cars that were emblazoned with his company's logo, and his company's name was always announced along with his own name at these races. The taxpayer argued, and the IRS agreed, that the race car gave his business national exposure. Further, the taxpayer argued that he met prominent people who may be interested in purchasing airplanes at these races. Because the taxpayer's name and company were announced at each race, there was a logo on the car, and the marketplace of race car spectators and airplane purchasers were similar, the IRS held that the race car expenses were ordinary and necessary expenditures in the airplane business.

Notably, the stronger the connection is between the sponsorship and the taxpayer's business, the more likely that the full cost of sponsorship will be deductible. In this regard, in *Ciaravella,* the Tax Court found that the full cost of the race car sponsorship was deductible because of the strong "connection between the excitement and appeal of racing cars and owning and flying in high performance jet aircraft[s]." T.C. Memo 1998-31 (1998).

Like the taxpayer in *Ciaravella* and the above-referenced cases and examples, the connection is strong between the Taxpayer's sponsorship and its business: (a) its manufacture of products that need no refrigeration and have a long shelf life are of interest to those interested in preparing for a doomsday scenario, exactly the type of audience that is the target of the EMPact organization; (b) the expenses incurred promoted the need for long-shelf life products needing no refrigeration, which is part of its trade or business, resulting in a tremendous amount of exposure and hence an economic benefit through the manufacture and sale of aseptic products; and, (c) customers choose the taxpayer over their competitors in large part due to its commitment to preparedness and security, which is evidenced by its involvement with EMPact.

As noted above, the taxpayer also has reaped an economic benefit by its ability to attract and retain excellent employees due to its sponsorship activities. Its focus on preparedness and protection (especially of its employees and their families) has become part of its corporate culture. The taxpayer's involvement with EMPact, which provides disaster preparedness training and other benefits to the local community, demonstrates to its employees who live in that area how dedicated their employer is to their protection and welfare. This provides a direct economic benefit to the company.  Additionally, Taxpayer employees gain the added benefit of freely participating in events and functions that aid their education and training, thereby increasing morale.   One example of a class that EMPact provided to employees of Taxpayer was a FEMA organized Community Emergency Response Team (CERT) Training class. This training taught life skills including first aid, fire safety, team organization and basic preparedness for emergencies.  Two CERT classes trained over 200 employees of Taxpayer in 2011 and continued training employees twice a year going forward. Employees were able to take their newly learned skills and support plant safety efforts.  This is merely one example of a number of different events that EMPact put on for the benefit of Steuben employees.  Over a dozen employee statements previously provided to the Service support this added economic benefit.

VI.     SUMMARY OF TAXPAYER'S POSITION

Taxpayer's contributions to EMPact have directly impacted the success of Taxpayer.  Its involvement has provided a tremendous amount of name recognition for both its product lines and company name within the community, along with aided its human resources efforts, and thus the expenditures at issue are strongly related to its business of producing aseptic products.  The Service, therefore, should grant the refund hereby requested with this Form 1120X.

-6-

# Exhibit

# A

LAW OFFICES

# MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

190 WILLIS AVENUE, MINEOLA, NY 11501

TELEPHONE: (516) 747-0300

FACSIMILE: (516) 747-0653

INTERNET: www.meltzerlippe.com

*Avi Z. Kestenbaum, Esq.*
*Ext. 237*
*akestenbaum@meltzerlippe.com*

*Scott L. Newman, Esq.*
*Ext. 506*
*snewman@meltzerlippe.com*

*Video Conference Facilities*

December 16, 2013

Ms. Joanne Lechtner
Mr. Robert P. Tuozzo
Internal Revenue Service
999 Stewart Avenue
Suite 110 (Group 1641 LB&I)
Bethpage, NY 11714

> Re:   Steuben Foods, Inc.
>         <u>Our File No. 11968-3</u>

Dear Ms. Lechtner and Mr. Tuozzo:

We hope both of you are well and we appreciate the opportunity to present more information as we discussed during our teleconference on December 3, 2013. The issue is the deductibility of contributions made by Steuben Foods, Inc. ("Steuben") to EMPact America, Inc. ("EMPact"). As we indicated, this letter and its enclosures prove that the contributions are very clearly deductible in their entirety, and that several key statements made during our teleconference are factually incorrect. We believe that most likely the statements were made without having the complete picture and that is the reason for this follow-up information. We are hopeful that after you review this letter and its enclosures, you will agree that Steuben is entitled to a complete deduction for the amounts it contributed to EMPact.

> *Statement 1*: *"There is no evidence on the internet linking Steuben to EMPact."*

First, as we stated on the phone, the internet is not the standard of evidence for any legal matter. That being said, a direct relationship between Steuben and EMPact is clearly visible from even a basic internet search. In addition, all of EMPact's federal filings (which are available to you and are of public record) clearly reflect Steuben's sole support of and substantial relationship with EMPact. To illustrate, we attach the following sampling of documents, all of which, except items A through C, are readily available on the internet:



Long Island's Business Law Firm ™

Ms. Joanne Lechtner
Mr. Robert P. Tuozzo
December 16, 2013
Page 2

 

 

A. *Form 1024 (Application for Recognition of Exemption Under Section 501(a))*
   i. In Part II, Item 1 (attached schedule), the narrative for Henry Schwartz states, "Mr. Schwartz is Chairman & founder of EMPact America, and CEO of Steuben Foods, Inc. and Elmhurst Dairy, Inc. (which fund EMPact America's efforts)."
   ii. In Part II, Item 1, the narrative indicates that "The organization receives most of its financial support from Steuben Foods, Inc., a for-profit corporation owned in part by one of the founders of the organization."

B. *Supplementary Responses to Form 1024*
   i. Requested affidavit of Henry Schwartz addresses the relationship between Steuben and EMPact, responding to the IRS concern that the entities will not be separate.

C. *2009 Financial Statements of EMPact America, Inc.*
   i. Note 2 indicates that, "The ownership of Stueben Foods, Inc. consists of <u>individuals that are members and directors of the Organization</u>" and lists $785,000 in contributions from Steuben to EMPact.

D. *2009 Form 990 (Return of Organization Exempt from Income Tax)*
   i. Schedule B, Part I lists Steuben as the sole contributor.

E. *Man Urges U.S. to Heed Electronic Terror Threat*
   i. Article from NBCnews.com/Associated Press.
   ii. Article identifies Henry Schwartz as the chairman of Steuben and as the founder of EMPact.

F. *The Threat of Electro Magnetic Pulse*
   i. Appears on several websites, including WBFO (Buffalo national public radio station).
   ii. Article identifies Henry Schwartz as the chairman of Steuben and as the founder of EMPact.
   iii. A quote in the article captures the goodwill that Henry Schwartz/Steuben generates: "What's in it for me?  Well, I have a family just like you probably do, and I'd like them to live.  I also have another family, and that's the employees I work with everyday.  I have a community, and I have the United States of America, and I want to hold onto them with all my heart and soul."

G. *EMPact Website Homepage*
   i. At the bottom of the EMPact website homepage, and at the bottom of <u>every other page</u> on the website, is the statement, "<u>Steuben Foods, Inc.</u> is the sole sponsor of EMPact America," with "<u>Steuben Foods, Inc.</u>" being a hyperlink to the Steuben website homepage.

H. *About EMPact America*
    i. The "About EMPact America" page on the EMPact website includes a prominently placed text box that states in bold, "Steuben Foods, Incorporated is the sole sponsor of EMPact America. EMPact America thanks Steuben Foods for their support." "Steuben Foods, Incorporated" is a hyperlink to the Steuben website homepage.

I. *Elma's Steuben Foods Subject of National Geographic Explorer Documentary*
    i. The well known national documentary, *Electric Armageddon*, indicates that "Steuben Foods, Inc. is one of the largest employers in Western New York, and is among the nation's leaders in high-tech beverage and food manufacturing."
    ii. Also, the documentary states that Henry Schwartz, as Steuben's owner, "created EMPact and has an interest in protecting the electric grid."
    iii. We have enclosed a DVD of this documentary so that you may see the seriousness of the issue, and the direct connection between Steuben and EMPact.

J. *Western New York Zombie Preparedness Event*
    i. Event promotional materials prominently state that, "Steuben Foods is the primary sponsor of this event, and is the sole sponsor of EMPact America."
    ii. Also, event promotional materials include a description of Steuben and a link to the Steuben website.

K. *North American Conference on the Threat Posed by Electromagnetic Pulse (EMP) to U.S.*
    i. Conference materials indicate that Henry Schwartz, owner of Steuben, is the founder of EMPact.

L. *Steuben Exec Wants Word Out on Dangers of EMPs*
    i. *Buffalo Law Journal* article lists Henry Schwartz, the chairman and founder of Steuben, as the founder of EMPact.

M. *EMP (Electromagnetic Pulse) Conference*
    i. Promotional materials list Henry Schwartz, the owner of Steuben, as the founder of EMPact.
    ii. Publications include *The National Terror Alert Response Center, Homeland Security News and Information*.

N. *EMP Commission, Profile of Institute for Policy Studies*
    i. Highlights EMPact and indicates Steuben was a co-sponsor of an EMPact event.

O. *Fighting to Protect the Electric Grid*
    i. Articles list Henry Schwartz, the owner of Steuben, as the founder of EMPact.

Ms. Joanne Lechtner
Mr. Robert P. Tuozzo
December 16, 2013
Page 4

    *P. NIAGARA FALLS: Trying to Make an EMPACT*
        i. Links Steuben to EMPact.
    *Q. Businessman: US Must Heed EMP Terror Threat*
        i. Associated Press article links Henry Schwartz, chairman of Steuben, to the formation of EMPact.
    *R. Experts: US "Unprepared" for Potential Iran Attack*
        i. Article links "prominent businessman" Henry Schwartz to the formation of EMPact.
    *S. Biz Exec Wants Word Out on "EMPs"*
        i. *Buffalo Business First* article lists Henry Schwartz, chairman and founder of Steuben, as the founder of EMPact.
    *T. EMPs a Real Threat, Conference Told*
        i. *Buffalo Business First* article lists Henry Schwartz, chairman of Steuben, as the founder of EMPact.
    *U. Tackl'n-the-Basics*
        i. Free fishing demonstration clinics sponsored by Steuben and EMPact.

    ***Statement 2:*** ***"I have never even heard of Steuben and Steuben's advertising expenses in this matter are not warranted."***

Candidly, it is very upsetting that the Internal Revenue Service would try to use personal knowledge as a basis for forming a conclusion. Certainly, as the enclosures clearly illustrate, Steuben is a very large and prominent company. Steuben has annual revenues in excess of $150,000,000 and is one of the largest employers in Western New York with in excess of 500 employees. As stated in our October 29, 2013 memorandum regarding the deductibility of Steuben contributions to EMPact, the contributions are equal to          of Steuben's gross revenue in fiscal years ending July 31, 2010, and July 31, 2011, respectively.

As the documents listed in section 1 above and this section below clearly prove, these contributions are reasonable for a company as large as Steuben and resulted in significant visibility within and outside the Western New York region. The social good that EMPact, as a result of Steuben's support, has been able to foster has greatly increased the value of Steuben's brand and goodwill. Any reasonable advertising expenses that are directly related to business activities, such as Steuben's contributions to EMPact, are deductible. For example, as our October 29, 2013, memorandum concludes, expenses related to the cost of goodwill advertising to keep a company's name before the public are deductible if there is a reasonable belief that this will lead to revenue. Certainly, Steuben's visibility resulting from its EMPact contributions are within these parameters. Just look at all of the amazing local and national publicity for the good that Steuben does. In addition to the documents listed in section 1 above, please see the following attached documents.

638333-6

A. *Schumer Urges NYPA to Craft Long Term Energy Contract With Steuben Foods; Longer Contract Would Assist Company with Critical Expansion and Job Creation*
   i. Citing the importance of Steuben to the Western New York economy, and the ability of the company to be the "lifeblood" of the region, New York State Senator Charles E. Schumer urged the New York Power Authority to enter into a long term energy contract with Steuben.

B. *Will "Steuben Patents" Dampen Growth of Aseptics in Bottles?*
   i. Article in *Packaging World* highlights the discussion at an industry conference regarding the effect Steuben has on the packaging industry.

C. *International Dispensing Corporation Announces Agreement with Steuben Foods to Market New Aseptic Product Lines*
   i. Press release announcing the collaboration between International Dispensing Corporation and Steuben.

D. *List of Articles Regarding Steuben*
   i. A list of articles that reference Steuben.

E. *ECIDA OKs Packages for Steuben, New Era*
   i. *Buffalo Business First* article reports the Erie County Industrial Development Agency's incentive package for Steuben.

F. *Steuben Foods Completes Elma Takeover*
   i. *Buffalo Business First* article reports Steuben's takeover of its Elma facility from the Erie County Industrial Development Agency.

G. *'83 Deal Fueled Steuben Foods Growth*
   i. *Buffalo Business First* article describes Steuben's move to Elma.

H. *Funds Flow to WNY Expansion Projects*
   i. *Buffalo Business First* article reports the Empire State Development's incentive grants to Steuben.

I. *Lafayette, Steuben Snag Empire Grants*
   i. *Buffalo Business First* article reports Steuben's award of an incentive grant.

J. *Low-Cost Electric Deals OK'd for WNY Cos.*
   i. *Buffalo Business First* article reports the approval of a long-term hydropower contract with Steuben.

K. *Steuben Foods, Inc. Selected Readings*
   i. List of articles that reference Steuben.

L. *Steuben Foods, Inc. Patents*
   i. List of Steuben patents.

M. *Steuben Foods Introduces Innovative Store Brand Refrigerated Desserts & Milk*
   i. Press release announcing new food products.

N. *Erie County Industrial Development Agency*
   i. Inducement resolution details.

Ms. Joanne Lechtner
Mr. Robert P. Tuozzo
December 16, 2013
Page 6

_Statement 3_:  "**_Steuben must have back up generators and, therefore, has no need to protect the electric grid._**"

A. In _Fighting to Protect the Electric Grid_ (item O in section 1 above), the author, <u>noting the importance of the electric grid</u>, states "Henry Schwartz's business runs on electricity."

B. Despite the Internal Revenue Service statement, which candidly was very upsetting that such an unqualified opinion was made off the cuff, Steuben does not in fact have generators that are capable of running the Steuben operations in the event Steuben is unable to receive electricity from the grid. Additionally, Steuben, or any company of its size, would never have the ability to store enough fuel to power the generators for the long term.

C. In National Geographic's _Electric Armageddon_ documentary (see item I in section 1 above), Steuben's lead engineer, Leigh Pearson, stated that it was <u>beyond Steuben's capabilities to make its operations protected without securing the electric grid</u>.

Once again, we are very upset by the way this audit has been handled, and that unqualified statements were made. In our over thirty years of combined practice in this area, we have not been involved in an audit in which similar "evidence" and off the cuff statements made by the Internal Revenue Service have been cited as support for a position. In fact, as you can see, we cannot think of a more clear case where proportionally very minor company expenses are 100% deductible as advertising, goodwill <u>and</u> as necessary for the company's operations. In fact, each one of these reasons alone would warrant 100% deductibility -- when all of these reasons are combined and the amounts in question are relatively insubstantial, as in the present case with Steuben, there should be no doubt regarding complete deductibility.

In light of this letter and its enclosures, we hope you will reconsider your position and statements regarding the deductibility of Steuben's contributions to EMPact and look forward to having a follow-up discussion with you. Thank you.

Sincerely,

Avi Z. Kestenbaum, Esq.

Scott L. Newman, Esq.

Enclosures

638333-6

LAW OFFICES

# Meltzer, Lippe, Goldstein & Breitstone, LLP

190 WILLIS AVENUE, MINEOLA, NY 11501

TELEPHONE: (516) 747-0300

*Avi Z. Kestenbaum, Esq.*
*Ext. 237*
*akestenbaum@meltzerlippe.com*

FACSIMILE: (516) 747-2956

INTERNET: www.meltzerlippe.com

*Scott L. Newman, Esq.*
*Ext. 506*
*snewman@meltzerlippe.com*

*Teleconference Facilities*

May 7, 2014

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
Internal Revenue Service
999 Stewart Avenue
Suite 110 (Group 1641 LB&I)
Bethpage, NY 11714

      Re:    Steuben Foods, Inc.
             <u>Our File No. 11968-5</u>

Dear Ms. Lechner and Mr. Tuozzo:

We are writing in response to your memorandum dated April 3, 2014, and its enclosed Forms 5701 (Notice of Proposed Adjustment) and 886A (Explanation of Items) (collectively, the "Forms") regarding the deductibility of contributions made by Steuben Foods, Inc. ("Steuben") to EMPact America, Inc. ("EMPact"). We are disappointed that the Forms continue to reflect a narrow view of what constitutes ordinary and necessary business expenses, seemingly colored by your personal views. It is apparent in the Forms, as well as by prior statements made by Ms. Lechner to us as outlined in our letter to you dated December 16, 2013, that your not knowing or understanding Steuben's business and its exposure to threats to the electric grid are unduly impacting your analysis of the deductibility of Steuben contributions to EMPact.

I.    <u>Applicable Law</u>

We agree with your recitation of the applicable law—namely, that a business expense is deductible only if such expense is both ordinary and necessary in carrying on a trade or business.[1] Further, donations to organizations other than those described in IRC Section 170 (i.e., charitable organizations), which bear a direct relationship to the taxpayer's business and are made with reasonable expectation of a financial return commensurate with the amount of the donation, may qualify as allowable business expenses under IRC Section 162.[2] This is substantively identical to our recitation of the law in our October 29, 2013 memorandum to the IRS.

---

[1] IRC § 162(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 113 (1933).
[2] Treasury Regulation § 1.162-15(b).

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 2

Our October 29, 2013 memorandum recites the components of a deductible business expense as follows:

"Ordinary" is defined as common or usual in one's business and acceptable or customary for one's business.[3]

"Necessary" means "appropriate" or "helpful," not "indispensable" or "required."[4]  If there are "reasonably evident business ends to be served, and the intention to serve them appears adequately from the record", expenses satisfy the "necessary" requirement.[5] Inherent in the concept of necessary is that the expenditure must be reasonable in relation to its purpose.[6]

While the relevant law is clear, there is no bright line test to determine whether a particular company expense is both ordinary and necessary to the company's carrying on its trade or business.  The analysis in each case is based on the particular facts and circumstances of the expense and the business.  While we agree with you regarding the law, we respectfully disagree with your application of the law to Steuben and its contributions to EMPact.

II.    Steuben's Contributions to EMPact are Ordinary and Necessary Business Expenses

At issue is whether Steuben's contributions to EMPact in fiscal years 2010 and 2011 were ordinary and necessary business expenses of Steuben.  The Forms characterize the expenses at issue as "convention sponsorship," which is the description provided on Steuben's federal income tax returns for the fiscal years ending July 31, 2010 and July 31, 2011.  As the Forms presuppose, this description was made in error by the preparer on the returns as a result of an inadvertent carryover by the preparer's tax preparation software from a prior tax year that was never corrected.  These expenses were in fact contributions to EMPact to raise public awareness of the vulnerability of the electrical power grid.  These contributions were neither earmarked to sponsor a convention, nor were they used by EMPact exclusively to sponsor a convention. Instead, as described below, Steuben made these contributions to EMPact as an ordinary and necessary business expense in furtherance of Steuben's business necessity of protecting the electrical power grid, and they were used by EMPact in its sole discretion to raise awareness of the need to protect the electrical power grid—through various means of education, including sponsorship of a convention.

---

[3] IRS Publication 535.
[4] Ford v. Commissioner, 56 T.C. 1300, at 1305–1307 (1971).
[5] Jorgensen v. C.I.R., T.C. Memo 2000-138 [citing Manischewitz Co. v. Commissioner, 10 T.C. 1139, 1145, 1948 WL 229 (1948].
[6] See Boser v. Commissioner, at 1133; Stricker v. Commissioner; McCulloch v. Commissioner.

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 3

### A.  *Protection of a Vital Business Resource is an Ordinary and Necessary Expense*

Steuben's support of EMPact bears a direct relationship to its business, and your statement that these payments are not directly related to Steuben's business is simply wrong. Steuben's business is entirely reliant on electricity, and its operations would be severely impacted—including potentially a  total loss of the business—by even a temporary loss of the local electric power grid.  Access to electricity is so vital to Steuben that it was one of the primary reasons that its founder, Henry Schwartz, chose to locate its operational plant in Elma, New York.  Although Elma is a seven hour drive from its corporate headquarters and from Mr. Schwartz's home—not exactly a convenient spot to pick for his business—it was selected as the location for Steuben's plant operations due in significant part to its proximity to the electric power grid and the hydro-electric power generated by Niagara Falls.

Your contention that as a food manufacturer, the prevention of an Electro Magnetic Pulse disaster or any disaster affecting the electric power grid has no relevance to Steuben's business is simply false.  To the contrary, the prevention of a disruption of electric power is of utmost relevance to Steuben's business—Steuben's business operations would cease if electricity was lost by an Electro Magnetic Pulse or other damage to the electric power grid.  Put simply, if there is no power to run the plant at Steuben, Steuben has no business.  Electric power is the very lifeline of Steuben's business.

It is ordinary and necessary for every business to analyze threats to its viability and to plan and spend money to protect itself.  Businesses do so in countless numbers of ways, which are deemed ordinary and necessary, and are deductible without a second thought.  For example, would you question a deduction of a business's expense for property and casualty insurance? For security guards?  Alarm systems?  Risk and loss consultants?   Just as these expenses to protect a business asset are not questioned, neither should Steuben's contribution to EMPact, which serves to protect its electric supply, be subject to scrutiny.

It is also ordinary and necessary for a business to seek alternative sources of energy. Businesses hire energy consultants and explore and implement alternative energy supplies, including solar, wind, geothermal, biomass and hydro energy.  The deductibility of such expenses not only are not questioned, but often the government encourages such expenses through tax credits.  Would you have questioned these companies' expenses in exploring alternative sources of energy to protect their business operations?

Similar to a company securing its energy supply through diversification of the form of energy it uses, Steuben is securing its energy supply, through protection of its current energy supply, and such expenses should be deductible.  While it is tempting to let personal, and likely uneducated since this isn't your field, views impact your analysis, it is not for the IRS to tell

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 4

businesses such as Steuben how to protect themselves against the risk of electric loss and how to spend money to prevent such loss.

### B. *Contributions to EMPact Benefit Steuben*

Your statement that Revenue Ruling 73-113 is distinguishable from the facts in this case since "Steuben failed to show how its contributions to EMPact were calculated to reasonably result in a direct and current economic benefit to the taxpayer" ignores the reality which we have made clear in our prior writings to and conversations with you—that Steuben views the vulnerability of the electric power grid as a real and serious threat to its continued business operations. Additionally, increased public awareness of this threat is a direct result of EMPact's work in educating the public about it, and is resulting in action to secure the electric power grid. Only a few years ago, it would have been difficult to find any mainstream articles dealing with the vulnerability of the electric power grid. But today, as a simple Google search will illustrate, mainstream publications and news sources, such as the New York Times, the Wall Street Journal, CNN, Business Week, Fox News, Forbes and the Los Angeles Times, are focusing on this important issue, in no small part due to EMPact's efforts.

EMPact's efforts to increase awareness about the dangers to the electrical power grid have led directly to a more secure grid. The more protected and secure that the electric power grid becomes, the less likely that Steuben will lose power and have its business temporarily halted or even permanently stopped. Being able to continue to operate its business is beyond an economic benefit to Steuben—it is the only way it can make money. Further, the stability of Steuben, including protection from an electric power grid failure, is a very important factor when prominent and large customers hire Steuben, and also would be beneficial in any sale of the company.

In addition to protecting the electric power grid, which, in turn, protects Steuben's business and secures customers and business relationships, another benefit that Steuben has received as a result of its contributions to EMPact are the intangible benefits of goodwill and advertising. Our supporting materials sent to you under cover of our December 16, 2013 letter contain many excellent examples of media recognition of Steuben's association with EMPact. While it is difficult to determine the actual economic benefit to Steuben, any advertising consultant would agree that such positive media coverage and increased name recognition are of great benefit to the company.

Further, your implication that because Steuben generally produces products under a private label means that it does not benefit from advertising is misguided. First, Steuben has its own brands. Second, all companies—whether the clients they are targeting are the general public or other companies—must attract those clients and spend money on marketing and advertising to do so. In fact, the very companies that Steuben targets are food companies—that

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 5

is, companies that deal in a basic human necessity. Of particular significance to these types of companies is the ability to provide these products to consumers under all conditions. Thus, Steuben's contributions to EMPact have been particularly relevant in demonstrating to Steuben's clients that Steuben is stable and reliable and is committed to planning for the unexpected.

These tangible and intangible economic benefits are enjoyed by Steuben as a result of its contributions to EMPact. Although it is impossible to show the exact economic return the contributions have provided Steuben similar to money that all companies spend, relevant in the analysis of whether such expenses are ordinary and necessary is the amount of the expenses in relation to revenue. In the fiscal years ending July 31, 2010 and July 31, 2011, Steuben made contributions equal _____, respectively, of its gross revenue for that year. Thus, for a relatively insignificant expense relative to its gross revenue, Steuben received literally dozens of positive mentions at EMPact events through signage and advertising, in print television and radio coverage and in public accolades and recognition by government officials, as well as fostering incredible relationships with the local community. In fact, Steuben's revenue has grown year after year during the period which it funded EMPact. Steuben's activities help it attract Fortune 100 and 500 companies, as well as top employee talent. While you may not understand the nontraditional method of advertising nor the important business cause of protecting its electricity supply and unifying theme, your personal business judgment is neither a criterion of deductibility nor does it reflect the reality of the success of such contributions for Steuben.

### C. EMPact Has Expertise in Protecting the Electric Grid and Steuben Does Not

You are correct, as the Forms state, that "Steuben's business is not even remotely involved with the scientific research of Electro Magnetic Pulses." It is for this very reason that Steuben had to go outside of its business for help in protecting the electric power grid against vulnerabilities such as Electro Magnetic Pulses.

EMPact is an organization determined to educate the public and attempt to prepare the geographical region for the possibility of the disruption of the electric power grid. It is the leading organization in this area and has made great strides in spreading awareness of the vulnerability of the electric power grid and the repercussions of any failure of the grid. As evidenced by the number of recent articles that have appeared in the New York Times, the Wall Street Journal, the Los Angeles Times, Business Week, Forbes, Fox News and CNN, as well as in other publications, the threat to the electric power grid is both real and serious. (A small sampling of these articles is attached hereto as Exhibit A for your reference and edification.) The articles include coverage of the recent attack on an electric power grid that serves Silicon Valley, which illustrates the vulnerability of the electric power grid and its attractiveness as a target. And you may recall vividly the 2003 blackout that affected eight states, including New York State, and Canada and the turmoil that followed – one of the causes of that blackout was a

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 6

surge of electricity to the western New York State electric power grid. We attach for your reference as Exhibit B an article regarding the 2003 blackout. The 2003 blackout is an illustration of the exposure of the electric power grid and the effect of losing the electric power grid even temporarily.

> D. *Generators Are Not a Viable Solution and the IRS Is Not Expert in Steuben's Business*

Your continued suggestion that generators are an alternative and acceptable solution to a loss of the electric power grid is troubling and disappointing. As a primary matter, generators are only temporary solutions to a short term power shortage for certain businesses. They would not protect a company with electrical needs as large as Steuben's in the event of a serious power outage. It would take an impractically large amount of generators to power Steuben's facilities, and it would be impossible to store the amount of the fuel they would require.

As a secondary matter, the IRS is not in the food processing business. As such, it is disconcerting that it presumes it knows more about assessing and managing risks of the food business than Steuben, a successful business in that field that is one of the largest employers in western New York State with over 500 employees. We are not sure how the IRS thinks it is qualified to make such comments, and it is shocking.

> E. *Connection Between EMPact, Steuben and Henry Schwartz Is Not the Relevant Inquiry*

The connection between Henry Schwartz, EMPact and Steuben is not the relevant inquiry in determining whether Steuben's contributions to EMPact are deductible. Nonetheless, in our conversation on December 3, 2013, Ms. Lechner very specifically indicated her concern about the deductibility of the expenses since "there is no evidence on the internet linking Steuben to EMPact." In response to her statement under cover of our letter dated December 16, 2013, we provided a cache of documents widely available on the internet showing the link between Steuben and EMPact. Then, after being shown this connection, you question "Would these payments from Steuben to EMPact have been made if Henry Schwartz was not, the principal of both entities?" This statement implies that it is Mr. Schwartz's connection with EMPact and not Steuben's business purposes that is the reason why Steuben made the contribution to EMPact.

Although you attempt to use both sides of the argument depending on the facts before you—first that no connection means no deduction, and then that too strong of a connection means no deduction—whether there is a connection or not between Steuben and EMPact is not what determines whether the expense is deductible. In fact, the Court in The B. Manischewitz

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 7

Company v. Commissioner of Internal Revenue[7], which the IRS highlights in the Forms, stated that mixed motivations (i.e., personal and business) for making a contribution will not disqualify such contribution for a full deduction. In that case, the Court recognized that there must have been some personal motivation for B. Manischewitz Company to contribute to a Jewish seminary because Rabbi Manischewitz had created the seminary. The Court indicated that the relevant inquiry is, however, whether the contribution to the seminary bore a direct relationship to B. Manischewitz Company and if it was made with a reasonable expectation of financial return commensurate with the contribution.

As such, in applying this case the relevant inquiry is whether Steuben's contribution to EMPact was made with reasonable expectation of financial returns commensurate with the contribution. As detailed in paragraph B above, Steuben has received substantial tangible and intangible economic benefits as result of its contribution to EMPact particularly in relation to the relatively small amounts spent on such contributions. Thus, under this test, such contributions are deductible.

> ### F. No Lobbying

We agree that any portion of Steuben's contributions to EMPact that were directed for lobbying would not be deductible, however, no contributions from Steuben to EMPact were directed or intended for lobbying. Furthermore, the vast majority of EMPact's activities, if not all of its activities, do not constitute lobbying. To the contrary, EMPact's activities were centered around public education and awareness of the importance of the electric power grid and its vulnerability to attack.

## IV.   Conclusion

As explained above and in prior correspondence and telephone discussions, the protection of the electric power grid is essential to the viability of Steuben's business operations. Steuben executives have exercised their business judgment and determined that funding EMPact and raising awareness of the susceptibility of the electric power grid is a sound business decision to ensure Steuben's continued business operations through uninterrupted access to the electric grid. This has benefitted Steuben not only through its continued ability to operate its business, again which is entirely reliant on the electric power grid and the reason for its location in Elma, New York, but also from the advertising and goodwill that it has generated, the unifying company theme it has fostered, and the customers' belief in this stable, secure and model company due to its contributions to EMPact and its attempting to secure the electric power grid.

---

[7] 10 T.C. 1139 (1948).

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
May 7, 2014
Page 8

     In light of this letter, we hope you will reconsider your position regarding the deductibility of Steuben's contributions to EMPact, and we look forward to having a follow-up discussion with you.

     Thank you.

Sincerely,

Avi Z. Kestenbaum, Esq.

Scott L. Newman, Esq.

651550-7

LAW OFFICES

# Meltzer, Lippe, Goldstein & Breitstone, LLP

190 WILLIS AVENUE,  MINEOLA, NY 11501

TELEPHONE: (516) 747–0300

FACSIMILE: (516) 747–0653

INTERNET: www.meltzerlippe.com

*Avi Z. Kestenbaum, Esq.*
*Ext. 237*
*akestenbaum@meltzerlippe.com*

*Mary P. O'Reilly, Esq.*
*Ext. 286*
*moreilly@meltzerlippe.com*

*Scott L. Newman, Esq.*
*Ext. 506*
*snewman@meltzerlippe.com*

*Video Conference Facilities*

July 25, 2014

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
Internal Revenue Service
999 Stewart Avenue
Suite 110 (Group 1641 LB&I)
Bethpage, NY  11714

      Re:    Steuben Foods, Inc.
              <u>Our File No. 11968-5</u>

Dear Ms. Lechner and Mr. Tuozzo:

      We hope both of you are well and are enjoying the summer.

      As we discussed at our meeting on June 19, 2014, the contributions by Steuben Foods, Inc. ("Steuben") to EMPact America, Inc. ("EMPact") are ordinary and necessary business expenses.  It is ordinary and necessary for businesses such as Steuben to spend money on advertising and business development to attract customers.  It is ordinary and necessary for businesses such as Steuben to spend money on protecting their resources which allow them to do business.  It is ordinary and necessary for businesses such as Steuben to spend money to attract the best employees and retain these employees by creating a positive work environment, team atmosphere, work culture and common mission.  It is, however, most extraordinary for one type of business expenditure to simultaneously meet all of these needs of a business—and that is just what Steuben's contributions to EMPact achieve.

      As requested, we enclose the following as documentation of the above:

1. Copies of some articles, publications and documents of public record that reference Steuben in connection with EMPact showing evidence of the goodwill and advertising that Steuben has gained as a direct result of its contributions to EMPact.

**ML Meltzer Lippe**

*Long Island's Business Law Firm*

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
July 25, 2014
Page 2

A.  *Form 1024 (Application for Recognition of Exemption Under Section 501(a))*
    i.  In Part II, Item 1 (attached schedule), the narrative for Henry Schwartz states, "Mr. Schwartz is Chairman & founder of EMPact America, and CEO of Steuben Foods, Inc. and Elmhurst Dairy, Inc. (which fund EMPact America's efforts)."
    ii. In Part II, Item 1, the narrative indicates that "The organization receives most of its financial support from Steuben Foods, Inc., a for-profit corporation owned in part by one of the founders of the organization."

B.  *Supplementary Responses to Form 1024*
    i.  Requested affidavit of Henry Schwartz addresses the relationship between Steuben and EMPact, responding to the IRS concern that the entities will not be separate.

C.  *2009 Financial Statements of EMPact America, Inc.*
    i.  Note 2 indicates that, "The ownership of Steuben Foods, Inc. consists of individuals that are members and directors of the Organization" and lists $785,000 in contributions from Steuben to EMPact.

D.  *2009 Form 990 (Return of Organization Exempt from Income Tax)*
    i.  Schedule B, Part I lists Steuben as the sole contributor.

E.  *Man Urges U.S. to Heed Electronic Terror Threat*
    i.  Article from NBCnews.com/Associated Press.
    ii. Article identifies Henry Schwartz as the chairman of Steuben and as the founder of EMPact.

F.  *The Threat of Electro Magnetic Pulse*
    i.  Appears on several websites, including WBFO (Buffalo national public radio station).
    ii. Article identifies Henry Schwartz as the chairman of Steuben and as the founder of EMPact.
    iii. A quote in the article captures the goodwill that Henry Schwartz/Steuben generates: "What's in it for me?  Well, I have a family just like you probably do, and I'd like them to live.  I also have another family, and that's the employees I work with every day.  I have a community, and I have the United States of America, and I want to hold onto them with all my heart and soul."

G.  *EMPact Website Homepage*
    i.  At the bottom of the EMPact website homepage, and at the bottom of every other page on the website, is the statement, "Steuben Foods, Inc. is

660021-8

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
July 25, 2014
Page 3

the sole sponsor of EMPact America," with "<u>Steuben Foods, Inc.</u>" being a hyperlink to the Steuben website homepage.

H. *About EMPact America*

    i. The "About EMPact America" page on the EMPact website includes a prominently placed text box that states in bold, "<u>Steuben Foods, Incorporated</u> is the sole sponsor of EMPact America. EMPact America thanks Steuben Foods for their support." "<u>Steuben Foods, Incorporated</u>" is a hyperlink to the Steuben website homepage.

I. *Elma's Steuben Foods Subject of National Geographic Explorer Documentary*

    i. The well-known national documentary, *Electric Armageddon*, indicates that "Steuben Foods, Inc. is one of the largest employers in Western New York, and is among the nation's leaders in high-tech beverage and food manufacturing."

    ii. Also, the documentary states that Henry Schwartz, as Steuben's owner, "created EMPact and has an interest in protecting the electric grid."

    iii. We have enclosed a DVD of this documentary so that you may see the seriousness of the issue, and the direct connection between Steuben and EMPact.

J. *Western New York Zombie Preparedness Event*

    i. Event promotional materials prominently state that, "Steuben Foods is the primary sponsor of this event, and is the sole sponsor of EMPact America."

    ii. Also, event promotional materials include a description of Steuben and a link to the Steuben website.

K. *North American Conference on the Threat Posed by Electromagnetic Pulse (EMP) to U.S.*

    i. Conference materials indicate that Henry Schwartz, owner of Steuben, is the founder of EMPact.

L. *EMP (Electromagnetic Pulse) Conference*

    i. Promotional materials list Henry Schwartz, the owner of Steuben, as the founder of EMPact.

    ii. Publications include *The National Terror Alert Response Center, Homeland Security News and Information.*

M. *EMP Commission, Profile of Institute for Policy Studies*

    i. Highlights EMPact and indicates Steuben was a co-sponsor of an EMPact event.

N. *Fighting to Protect the Electric Grid*

Meltzer, Lippe, Goldstein & Breitstone, LLP

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
July 25, 2014
Page 4

          i. Articles list Henry Schwartz, the owner of Steuben, as the founder of EMPact.
O. *NIAGARA FALLS: Trying to Make an EMPACT*
          i. Links Steuben to EMPact.
P. *Businessman: US Must Heed EMP Terror Threat*
          i. Associated Press article links Henry Schwartz, chairman of Steuben, to the formation of EMPact.
Q. *Experts: US "Unprepared" for Potential Iran Attack*
          i. Article links "prominent businessman" Henry Schwartz to the formation of EMPact.
R. *Biz Exec Wants Word Out on "EMPs"*
          i. *Buffalo Business First* article lists Henry Schwartz, chairman and founder of Steuben, as the founder of EMPact.
S. *EMPs a Real Threat, Conference Told*
          i. *Buffalo Business First* article lists Henry Schwartz, chairman of Steuben, as the founder of EMPact.
T. *Tackl'n-the-Basics*
          i. Free fishing demonstration clinics sponsored by Steuben and EMPact.

2. Statements from Steuben executives explaining how Steuben's support of EMPact has helped it attract business and customers and set it apart from its competitors.

    A. *Statement of Jeffrey Sokal, Senior Vice-President of Business Development of Steuben*
    B. *Statement of Julie Senko, head of Human Resources and Co-Chief Financial Officer of Steuben*
    C. *Statement of Frank Balon, Esq., head of the legal department and Co-Chief Financial Officer of Steuben*
    D. *Statement of Brian Manka, Esq., Legal Department of Steuben*

3. Statements explaining what EMPact has done to secure the grid which serves to directly protect Steuben's energy supply needed to keep its business in operation. You will note that two statements are from Dr. Peter Vincent Pry, the Executive Director of the Task Force on National and Homeland Security, and Kenneth D. Chrosniak, Brigadier General (retired). Just today, you may have heard all over the news that NASA announced that a solar flare just missed the earth two years ago which would have shut down the electric grid and caused trillions of dollars of damage to businesses and infrastructure and there is a 12% chance that it will happen

Meltzer, Lippe, Goldstein & Breitstone, LLP

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
July 25, 2014
Page 5

again in the next 10 years.  This is the exact type of damage that Steuben is trying to protect its business from with its contributions to EMPact.

    A.  *Statement of David Bellavia, President of EMPact*
    B.  *Statement of Dr. Peter Vincent Pry, Executive Director of the Task Force on National and Homeland Security and Director of the U.S. Nuclear Strategy Forum*
    C.  *Statement of Kenneth D. Chrosniak, Brigadier General (Retired, New York National Guard)*

4.  Statements and letters evidencing that Steuben's support of EMPact and the employee training and preparedness programs presented by EMPact have positively impacted employees' decisions to work at Steuben and have fostered a positive work environment that sets Steuben apart from other potential employers.  Please note that it is well-known that companies that promote a common mission, unifying theme and/or support a social good are more successful than other companies that do not do this.  There are a plethora of books and materials dedicated to this topic, and we will be happy to send you samples showing this relationship to the success of a company.

    A.  *Statement of Amy Thompson, employee of the West Seneca Chamber of Commerce and a member of the Elma and West Seneca CERT teams*
    B.  *Statement of Kimberly Scheelar, Human Resources Manager of Steuben*
    C.  *Statement of Andrea Scanzuso, Human Resources Manager of Steuben*
    D.  *Statement of Ken Stanley, Plant Manager of Steuben*
    E.  *Letter from Michelle McCulloch, employee of Steuben*
    F.  *Letter from Megan McCulloch, employee of Steuben*
    G.  *Letter from Nicholas Budniewski, employee of Steuben*
    H.  *Letter from Linda Jablonski, employee of Steuben*
    I.  *Letter from Bonnie Witt, employee of Steuben*

We understand that Steuben's contributions to EMPact are ordinary and necessary business expenses, and hope that you will agree after reading the enclosed documents.  All businesses like Steuben allocate resources to advertising, business development, protection of operations, and creating a positive work environment to attract and retain the best employees.  As evidenced by the enclosed, Steuben's contributions to EMPact accomplish all of these business needs, and for a relatively insignificant expense: <u> , respectively, of Steuben's gross revenue in fiscal years 2010 and 2011</u>.  Also, as we discussed, Mr. Schwartz

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Ms. Jo-Ann Lechner
Mr. Robert P. Tuozzo
July 25, 2014
Page 6

would be very pleased to meet with you in person to discuss and explain this matter in further detail.

     Thank you.

                                 Sincerely,

                                 Avi Z. Kestenbaum, Esq.

                                 Mary P. O'Reilly, Esq.

                                 Scott L. Newman, Esq.

660021-8

# Exhibit

# B



October 29, 2014

**<u>Via Overnight Delivery</u>**
Mr. Robert Tuozzo
Department of the Treasury
IRS
999 Stewart Avenue
Bethpage, New York 11714

### Re: Steuben Foods, Inc./EMPact America, Inc.

Dear Mr. Tuozzo:

I recognize that the Internal Revenue Service requires additional insight into Steuben Foods' expenditures in support of EMPact America, Inc. The IRS found that these expenses are not *ordinary* and *necessary*, thus failing to qualify for tax deduction. Having dedicated my life to my family's businesses, including Steuben Foods, Inc., this is very disappointing to me. The incurred expenditures were both *ordinary* and *necessary*, meeting IRS criteria for tax deductibility.

I am providing for your review a broad set of facts and documentation to help you understand the expenses incurred. There are three primary and distinct reasons that the expenditures were both *ordinary* and *necessary*: 1.) *Steuben Foods' existence and viability as a business are dependent upon its power supply*; 2.) *Preparedness is part of Steuben Foods' primary business strategy*; and 3.) *EMPact enhances Steuben Foods' human resource efforts.*

These factors demonstrate the business purpose of protecting the electrical grid. By extension, they collectively support our position that Steuben Foods' expenditures in support of EMPact America are both *ordinary* and *necessary*.

We have provided you with a wealth of information about Steuben's relationship to EMPact, which, to my confusion, has not been enough. You have to recognize, further, that the money we are being inappropriately taxed is critical to our medium-sized, family-owned business. We have to leverage our relatively small capital base – including the funds in question – to finance the purchase of equipment necessary for growth. As a company that needs literally every dollar, your tax levy is holding-up our plans for some part of a very large expansion. As our substantial efforts do not seem to be enough to sway you, I request that you make an onsite fact-finding visit to Steuben and EMPact in Elma, New York; and make this a high priority. Here you will see for yourselves the connection between our vital, viable business and protection of its power supply. You will also understand the sobering degree to which electricity affects not only our business, but our collective livelihood. Please call me at 718-644-8200 to make an immediate appointment.

---

Mr. Robert Tuozzo
October 29, 2014
Page 2



Steuben is part of a long family business tradition, going back to the 1880s. We have not achieved this longevity by luck. It has been an experience in hard work, commitment, and proactively defending what we cannot do without – particularly our power supply. It began with two dairy farms in the adjacent Elmhurst and Middle Village neighborhoods of Queens. From this base, my father and uncle started Elmhurst Dairy in the 1920s. They bottled milk in my grandfather's farm milk house and delivered to the Scandinavian neighborhoods of Brooklyn in a single truck. It is to their great credit, and a testament to their spirit, that they outgrew these assets. They had to expand the operation, and relocated to an appropriate site in Queens' Jamaica neighborhood. This remains today's Elmhurst Dairy, and has grown from a single building on a less than 5,000 square foot site to multiple buildings on a 600,000-plus square foot site. Part of this growth has been the capacity to generate some of its own electricity, which it started to do after the Middle East oil embargo of 1973.

In support of its growth and ability to remain in business within a competitive New York City and Long Island market, Elmhurst eventually acquired a creamery in the small town of Prattsburg, within the Finger Lakes region of New York. This operation was on the front end of the yogurt revolution. As a result, it achieved a joint venture with Kellogg's for production of Whitney's Yogurt in 1980. The resulting company was named Steuben Foods after the county in which the plant was located.

Before long, Steuben outgrew Prattsburg. Among the contributing factors were electricity costs, which were challenging our profit margins. Thus, we migrated to the doorstep of the greatest renewable energy source in the Northeast: Niagara Falls. In coordination with the Erie County Industrial Development Agency, we were able to obtain a shut-down, partially-built Western Electric/AT&T manufacturing plant in Elma, New York, not far from Buffalo. Here we seized the opportunity for economic hydropower as provided to us by the New York Power Authority. From this beginning, Steuben Foods' Elma site has grown exponentially. From a few relatively modest production lines in 1985, we now have over twenty high-tech, low-acid, multi-million dollar aseptic and ESL lines, and over $250 million in investments made by Steuben Foods, public agencies, customers and suppliers.

Today's Steuben Foods specializes in low-acid aseptic products, usually dairy-based. By nature, such products have a long shelf-life and typically do not require refrigeration. These advantages come at a price, however. Aseptic products are expensive to produce, particularly the high-quality, value-added varieties in which we specialize. We could not be in this business without an uninterruptable supply of low-cost power, where even relatively short interruptions can cost hundreds of thousands of dollars in losses, as all in-process product usually has to be discarded. Reliable and inexpensive electricity protects against this contingency, while enabling the profit margins necessary for growth and sustainability. This is why, from comparatively humble beginnings, today's plant spans 400,000 square feet and employs over 500 people. With the support and understanding of government authorities, we believe the latter number will grow to over a thousand by 2024.

*Steuben Foods Incorporated*
*1150 Maple Road, Elma, NY 14059*
*716-655-4000 — FAX 716-655-4078*

Mr. Robert Tuozzo
October 29, 2014
Page 3



It is also important to understand the nature and urgency of EMPact America. Founded in 2009, EMPact America, Inc. is a non-profit organization committed to protecting Western New York's electrical grid from the event of an electromagnetic pulse (EMP). An EMP could occur either from a solar flare or nuclear weapon detonated high above the Earth's atmosphere. Its effect would be to cripple the electrical grid over a wide area, possibly for many years. In 1989, a relatively low-intensity geomagnetic storm struck Quebec – not far from Steuben. The results were staggering. The event cost $6 billion total. The Toronto Stock Exchange shut-down for two days; as did 116 utilities – either partially or totally – across Eastern Canada and parts of the adjacent Northeastern United States. This gives a sense of what might someday happen in a much more severe manner.

EMPact America's work is based on the fact that such a catastrophe is not only possible, but potentially fatal to Steuben Foods, being a single-plant family-owned business. Furthermore, it is not so much a matter of *what* as *when*. Major solar storms struck the Earth's electromagnetic field in 1859 and 1921, before there was an electrical grid or microelectronics. The 1859 storm, known as the Carrington event, remains the most severe ever recorded – a one-hundred year occurrence for which we are now overdue. The nation was spared devastation only by its lack of dependency upon electricity. Still, thousands of miles of telegraph lines across the Northern Hemisphere were fried. This is a chilling predictor of the future. We have since become totally dependent upon the grid and electronics in every way, including for life itself and our very existence. Next time – and there will be a next time – we will not be so lucky.

The federal government is aware of the threat. Two reports by a congressional EMP commission, issued in 2004 and 2008, illustrate the likelihood and consequences of an electromagnetic pulse in stark detail.[1] R. James Woolsey, former Director of the Central Agency under President Clinton, explained:

> An EMP attack would collapse the electric grid and other infrastructure that depends on it – communications, transportation, banking and finance, food and water – necessary to sustain modern civilization and the lives of 300 million Americans.

This bleak assessment is corroborated by the scientific community, as represented by John Kappenman of Storm Analysis Services:

> Unlike the more familiar natural hazards or terror threats, both geomagnetic storms and EMP can have a large geographic footprint which can readily encompass major portions of the US electric grid.

---

[1] http://empactamerica.org/our-work/why-is-emp-a-threat/the-emp-commission/commission-reports/

Mr. Robert Tuozzo
October 29, 2014
Page 4



I am not the only businessperson who is concerned.  In 2014, billionaire hedge fund manager Paul Singer warned his clients that an EMP is a "risk that stands way above the rest in terms of the scope of potential damage adjusted for the likelihood of occurrence."[2]   Even Great Britain is concerned for the United States.   Specialist insurance company Lloyd's of London, in a 2013 report, cited grave danger to the United States, including New York State: "The total U.S. population at risk of an extended outage from a Carrington-level storm ranges between 20-40 million with durations up to 1-2 years" – enough to alter civilization, not to mention business, as we know it.[3]  Much of this focuses upon the random – but very real – event of solar storms. However, there is at least equal risk of a man-made EMP, which could be targeted to a specific location: most likely a population center like New York.  This scenario could be produced by a rogue nation like North Korea or Iran, when they acquire – and they are reported to be close – the technology to equip a long-range missile with a nuclear warhead.

The full gravity of the threat, as testified to by the above sources, is reflected in EMPact's threefold mission to *prepare* for the event, *protect* against it and *recover* in case it should occur.   Steuben's corporate survivability depends on fulfillment of this mission.

There are three prongs to the purpose for Steuben Foods' support of EMPact America, all of which make the expenditures both *ordinary* and *necessary*.

*Steuben Foods' existence and viability as a business are dependent upon its power supply.*  Without electricity there would be no Steuben Foods.  It is true that the same statement applies to many companies – which only makes investment in the protection of power supply *ordinary*.  Steuben's competitive advantage is that most companies do not have the foresight to help prevent or provide for the contingency of a powerless New York State.  This makes Steuben's level of attention - embodied in its support of EMPact - very much *necessary* to both company and community.

Elmhurst, Steuben's sister company, is New York City's last dairy on account of this business insight.   Elmhurst is part of the same tradition as Steuben, and has experienced similar concerns.   Brownouts were common in New York through the 1970s.  Voltage drops would cause Elmhurst's large motors to be damaged.  Not only did these cost a great deal of money to repair; the process caused excessive downtime, during which packaged milk production shut-down.  This double economic hit, repeated many times, caused Elmhurst to reassess its relationship to the electrical grid.   The company moved to decrease its reliance upon the grid by installing its own generators. Thus, Elmhurst took care of its own energy needs and created a new economic boon in process.  A portion of its electric usage cost half of what it had before: a major economic advantage over all of its competitors.  After this, when a brownout occurred, Elmhurst

---

[2]  http://www.businessinsider.com/paul-singer-electromagnetic-pulse-risk-2014-7
[3]  http://empactamerica.org/our-work/emp-related-reports/

*Steuben Foods Incorporated*
*1150 Maple Road, Elma, NY 14059*
*716-655-4000 – FAX 716-655-4078*



continued to produce while its rivals suffered. Gradually, these companies went out of business until only Elmhurst remained. Today it is the primary dairy supplier to the New York metropolitan area.

Far from complacent, Elmhurst has enhanced its power generation capabilities over time. As a result, it maintains partial functionality even in the event of blackouts. Steuben is not presently using generators. The amount of power required to offset our use of the grid in a major way renders the capital expenditure necessary for such a project beyond our economic capabilities. We would be reliant upon unfeasible loans. However, we are presently working to install a single microturbine generator at Steuben Foods. This will be able to produce about 10% of our required energy – enough for access to and protection of our vast inventory in the event of a long-term grid failure. These products could then be used to feed our employees and families for two years.

Electricity being – particularly for a business – almost literally the difference between life and death, it is highly *necessary* for Steuben to make expenditures in EMPact America, an organization committed both to protecting and outlasting the electrical grid should a catastrophe occur. It is also *ordinary* for a company to take measures to preserve its business. This is inseparable from the concept of being a company.

Steuben is not only protecting its own business. Its investment, through EMPact, in protection of the electrical grid and alternative energy supply protects its customers' businesses, also. Being a contract manufacturer, an electrical failure at Steuben would mean failure to meet contractual obligations to customers. Steuben Foods takes this possibility more seriously than most. This is *necessary*, being a single-plant, family-owned business, based solely in the Eastern United States without a bicoastal presence. Yet, very tellingly, brand owners and other parties in our industry choose Steuben Foods[4] – as opposed to its many competitors, some of them larger, or self-manufacturing – to produce their products. This is a function of security. In light of real and poignant disasters like hurricanes Katrina and Sandy, Steuben offers its customers a viable disaster contingency plan, which is one of the major reasons they work with us. Many are sufficiently confident to enter into long-term – even permanent – contractual agreements, and forge strategic partnerships involving direct capital investment in our facility. These are large commitments, and would not be made outside of a fundamental trust in Steuben as the safest, most secure producer of one's products. This further demonstrates the business necessity of reliable energy, as achieved through EMPact America.

Hydropower was an indispensible factor behind Steuben Foods' move to Elma in 1985. The company saw the opportunity for inexpensive hydroelectricity, dependent on nothing except mother nature – *if protected against the event of an EMP*. Renewable hydroelectricity is a well-understood, well-promoted advantage of the Western New York region. Among the reasons Steuben's former Prattsburg plant was shut-down

---

[4] www.steubenfoods.com

Mr. Robert Tuozzo
October 29, 2014
Page 6



after fifty years was the electrical expenditure necessary to operate.  All of the employment that had been so important to this community was lost.  By contrast, the Elma facility has the advantage of proximity to Niagara Falls, New York State's greatest energy asset.  Steuben's nearby location is a direct testament to the close relationship between corporate sustainability and power.

The essential link between Steuben and EMPact's interests is crystallized at Niagara Falls.  It is more than just symbolism that the organization's founding conference in 2009 was literally held at the foot of the Falls.  This does not, however, explain what is meant by "the grid."  Consider that Niagara Falls will itself survive an EMP, yet – barring an extraordinary collective effort, spearheaded by EMPact with Steuben's help – the State will go dark.  Thus, one must internalize what happens *between* the raw power source – in this case, water – and its destination, Steuben Foods.  This is where the grid comes in.  It is the vital link between Niagara Falls and Steuben Foods in Elma; bringing electricity from the prior to the latter.

By protecting the utilities that constitute the grid, EMPact is protecting the very power upon which Steuben depends for its survival.  This begins with the infrastructure that channels Niagara Falls power to New York State.  In 2010, the New York Power Authority invited EMPact to the Robert Moses power plant in Lewiston in order to assess security and recommend improvements.  General Ken Chrosniak, John Kappenman, Dr. George Baker, Ross Howarth and Pete McMahon visited on EMPact's behalf.[5]  This was a historic moment: the first time the plant's doors were opened to a non-governmental interest for insight into security.  EMPact followed with one of its great achievements: participation in a groundbreaking effort to harden and modernize the Niagara-powered plant, which directly secured Steuben's very own energy supply.  This monumental project has become the gold standard for preparedness.  Thus, Steuben Foods' expenditures supporting EMPact have essentially been investments its own sustainable energy supply.  This makes them the very definition of *necessary*.

Steuben Foods has been a continuous customer of the New York Power Authority since its relocation to Elma in 1985.  From the time we opened our doors, all of our energy needs have been met through Niagara hydropower, which is delivered to Steuben through the grid and utilities like NYSEG.  From 2009 to 2010, Steuben was actively engaged with the New York Power Authority in an effort to preserve this vital energy source through negotiation of a long-term contractual extension.  In September 2010, our company was announced as one of two – out of 106 – Western New York businesses to be offered a fifteen year extension, through 2028, on its discounted energy contract.  This achievement recognizes Steuben's outstanding application of hydropower in support of the regional economy: providing both direct and indirect jobs; and nourishing the New York dairy sector, which accounts for 50% of the state's farm

---

[5] General Ken Chrosniak biography:  http://empactamerica.org/leadership/board-of-advisors/
John Kappenman biography: http://solarstormconsultant.com/sample-page/
Dr. George Baker biography: http://works.bepress.com/george_h_baker/cv.pdf

*Steuben Foods Incorporated*
*1150 Maple Road, Elma, NY 14059*
*716-655-4000 — FAX 716-655-4078*



economy. Senator Charles Schumer personally advocated for our cause: "A long term, stable, and predictable energy supply will allow Steuben Foods to thrive and grow, creating jobs and pumping cash into the regional economy." Growth was, indeed, part of the plan; the contract extension was contingent upon the company's commitment to make substantial capital investments. Steuben's willingness and ability to do so are exemplary of the interplay between energy and growth. This is the same reason that contributions to EMPact – a protector of this fantastic energy source – are absolutely *necessary.*

*Preparedness is part of Steuben Foods' primary business strategy. Preparedness* – the heart of EMPact America's mission – is not merely a word for Steuben Foods. Nor is it a reaction to circumstances. It is a proactive component of a tradition that preceded – and thus pervades – Steuben Foods. It is as much a part of the company as profitability, which is why the two are inseparable.

Steuben has demonstrated a pattern of investment in preparedness that has become very much *ordinary.* Support of the EMPact initiative is part of a chain that extends far back, to before Steuben Foods existed. The installation of a total energy plant at Elmhurst Dairy in 1974 is a powerful example of return on investment in preparedness. This was a major innovation, marking the first such installation in a New York City area manufacturing facility in modern times. It both saved electricity costs and immunized the site against brownouts. Steuben's 1985 move to the former Western Electric plant in Elma, driven by the opportunity for low-cost Niagara hydropower, is another example. The same theme continues with Steuben's present project to install a microturbine generator as an emergency standby power supply. Note that all of these expenditures – including those related to EMPact – have been subject to financial analysis for positive return on investment. Support of EMPact, then, is neither frivolity nor charity, but sound business strategy. This further affirms the *ordinary* and *necessary* nature of the expenses.

Another example of our sustained interest in the electrical grid is easy to overlook. It does not exist in machines, but Steuben's product base. The company installed its first aseptic lines in 1991. Previously everything had been refrigerated, thus grid-dependent. Loss of power caused the products to spoil. Aseptic processing and packaging, by contrast, allows nutritious low-acid products – including dairy – to sustain integrity, free of spoilage, at ambient temperatures for long periods of time. What Steuben Foods has essentially done is insulate the food supply from the grid. Aseptic products, and their protection in the event of a grid failure, will enable Steuben to feed all of its employees for two years after an EMP occurs.

EMPact America is a key part of this strategy. It is the paradigm of *necessary,* not only for its relationship to Steuben Foods, but its expression of corporate priorities. The organization was directly inspired by two urgent statements of national interest. The Federal Commission to Assess the Threat to the United States from Electromagnetic Pulse (EMP) was established pursuant to title XIV of the Floyd D. Spence National

Mr. Robert Tuozzo
October 29, 2014
Page 8



Defense Authorization Act for Fiscal Year 2001.  The commission circulated reports in 2004 and 2008.[6]  The following excerpt from the 2004 report represents the business case for investing in – and insulating against failure of – the electric grid:

> EMP is one of a small number of threats that can hold our society at risk of catastrophic consequences.  EMP will cover the wide geographic region within line of sight to the nuclear weapon [or solar flare].  It has the capability to produce significant damage to critical infrastructures and thus to the very fabric of US society, as well as to the ability of the United States and Western nations to project influence and military power.

The report further asserts:

> The current vulnerability of our critical infrastructures can both invite and reward attack if not corrected.  Correction is feasible and well within the Nation's means and resources to accomplish.

Being a reputed *doer* – on the cutting-edge of technology, research & development and preparedness – Steuben Foods has heeded this urgent call to action.   Through Steuben's support, EMPact America was founded in 2009.  This is one in a tradition of *necessary* investments for the company and Western New York community.  Steuben's approach to electrical security – pursued through EMPact – is also *ordinary* in that it: 1.) aspires to the goal of every company – to remain in existence and viable; and 2.) synergizes with community priorities.

*EMPact America enhances Steuben Foods' human resource efforts*.    This encompasses culture, retention and *espirit de corps*.  It is *ordinary* for any company to create meaning for its employees.   This is the essence of *culture*, and value is increasingly defined in these terms.  Material rewards like paychecks and conventional benefits will no longer suffice in isolation.  Employee satisfaction requires an infusion of meaning – whether outreach to the community or enhancement of one's own lifestyle.  Neglecting these elements, a business becomes less attractive to prospective talent and risks alienating its workforce.   This makes the cultural element of our human resource efforts *necessary* rather than merely optional.

EMPact America is a key element of Steuben's culture, retention and *espirit de corps*.  To date, the company has paid for 230 employees – almost half of its workforce – to attend Certified Emergency Response Training (CERT), a FEMA program.  This was not only in anticipation of an electromagnetic pulse, but any disaster that might happen to Steuben Foods or Western New York.  Various emergency response skills were taught – from operating a fire extinguisher to treating a wound.   EMPact also works meaningfully in the wider community.  For example, it administered two semester-long urban outreach programs imparting valuable life skills to participants in a Buffalo Public

---

[6] http://empactamerica.org/our-work/why-is-emp-a-threat/the-emp-commission/commission-reports/

Mr. Robert Tuozzo
October 29, 2014
Page 9



School system GED program. This is *necessary* to the business because it is from this pool that Steuben draws many of its entry-level employees.

EMPact routinely offers fishing, ham radio, safety, and other courses. These opportunities have cultivated massive goodwill and preparedness in the community. In 2012, the Center for Disease Control rated Buffalo the nation's number two city for preparedness. Erie County Commissioner of Emergency Management Daniel J. Nevereth, Jr. attributed the distinction to a remarkable synergy of private and public interests. Not surprisingly, he singled-out Steuben Foods' work in tandem with EMPact America. The opportunity to be part of something so large conveys a sense of pride and purpose while having a palpable impact upon the safety and security of the Steuben Foods facility.

It is both *ordinary* and *necessary* for Steuben Foods to invest in its workforce, community and future through EMPact America. EMPact's mission provides a vital link between Steuben Foods' employees and the wider community. It improves associates' lives. Equally importantly, it gives them a forum through which to make a difference to the Western New York community – a pattern of meaning that is both *ordinary* and *necessary* to today's successful business. Furthermore, the EMPact influence is pervasive. It is not an endeavor that comes and goes. It manifests itself in employee-driven safety and security initiatives, all of which are highly necessary given their role in protecting the business – which, in turn, would nourish the community in the event of a disaster. The Steuben human resource effort has, not surprisingly, benefitted enormously from EMPact's attractiveness to committed senior and entry level talent.

In conclusion, Steuben Foods' contributions to EMPact America are both *ordinary* and *necessary*. First, *Steuben Foods' existence and viability are dependent upon its power supply*; where existence and viability of a business are *ordinary* goals, and energy is understood to be *necessary*. Secondly, *preparedness is part of Steuben Foods' primary business strategy*. This approach has, again and again, proven the company's dependence on protecting the grid and preparing for the contingency of its failure. The level of commitment speaks to excellence in corporate innovation. Finally, *EMPact enhances Steuben Foods' human resource efforts*; where it is both *ordinary* and *necessary* for a company to nourish a culture of higher meaning and contribute to its employees' lifestyles in non-material ways - such as education and the opportunity to be part of a principled corporate culture. A more prepared workforce, in turn, reinforces the security of Steuben Foods' business against internal and external threats. From a staffing perspective, the positive corporate environment has made more people – both senior and entry level – want to work at Steuben Foods.

It is a profound coincidence that today, on the anniversary of Hurricane Sandy – which devastated the lives of so many people through lack of electricity here on Long Island – we ask you to reconsider our case. Hard as it is to believe, two years later, some of those affected are yet to recover. Through this lens, you will understand the urgency of EMPact's mission. An EMP is not a fanciful apocalyptic scenario. Its imminent threat is

Mr. Robert Tuozzo
October 29, 2014
Page 10



verified by history; the business, scientific and military communities; and our own government as a *fact*. As we could lose our business to an EMP any day, our support of EMPact America – an organization with the commitment and resources to defend against, and help us recover from, the event – is both *ordinary* and *necessary* relative to our existence and viability, business strategy, and human resource efforts.

We look forward to your arrival in Elma to see these words in action.


Very truly yours,

/s/ Henry Schwartz

Henry Schwartz
**President & Chief Executive Officer**


HS

LAW OFFICES

# MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

190 WILLIS AVENUE, MINEOLA, NY 11501

TELEPHONE: (516) 747-0300

FACSIMILE: (516) 747-0653

INTERNET: www.meltzerlippe.com

*Laurie B. Kazenoff, Esq.*
*lkazenoff@meltzerlippe.com*                                          *Video Conference Facilities*
*Tel: (516) 747-0030 ext. 283*
*Dir: (516) 470-0164*
*Fax: (516) 747-2956*

October 30, 2014

Internal Revenue Service
LB&I:FS:1641:RT:1st Floor
999 Stewart Avenue
Bethpage, NY 11714
Attn: Revenue Agent Robert Tuozzo

     Re:    Steuben Foods Incorporated
               EIN 22-2407431
               Form 1120
               Tax Years: 7/31/2010, 7/31/2011

Dear Mr. Tuozzo:

     I represent the above referenced taxpayer and a Power of Attorney is attached hereto. This POA is in addition to and does not replace previously filed powers of attorney.

     We are responding to your letter dated October 8, 2014 and hope that we can resolve this matter at the Examination level making an Appeals conference unnecessary. I recently joined Meltzer Lippe and was a former Senior Attorney with IRS Chief Counsel before being in private practice. I had the opportunity to review this case only as of last week and was able to see it with fresh eyes. We are herein offering an analysis of the facts and law that has not yet been presented to you previously in support of our position that the deductions were "ordinary and necessary" business expenses. As you know under the new Appeals procedures, any new facts or arguments presented require Appeals to send the case back to Examination for further development. That is why we hope to address these issues with you before the file is sent to Appeals or even before the issuance of a Notice of Deficiency, because it will help to resolve this case in the most expeditious way possible. We believe that what we are presenting herein gives you sufficient grounds for approving a resolution of this case. However, if after your review of this submission and after discussing the matter with us you still believe your position is correct and that it cannot be resolved, this letter will serve as our Appeals Protest and Request for an Appeals Conference, pursuant to the Letter 950 that was issued.



Long Island's Business Law Firm ℠

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Internal Revenue Service
October 30, 2014
Page 2

FACTS

As part of the package that was recently provided to us from your office, the IRS issued to the taxpayer a Form 4549-B Report of Income Tax Examination Changes wherein they disallowed "Other Deductions - Convention Sponsorship" of $785,000 and $344,638 for the tax periods ending July 31, 2010 and 2011, respectively. These amounts were paid to a 501(c)(4) organization called EMPact for the periods in question.  Also included was Form 886A "Explanation of Items" which outlined a version of the facts with applicable legal citations.

More specifically, the "Explanation of Items" disallows the expenses on the basis that they were not "ordinary and necessary" business expenses. The standard of review which it references is as follows: "Similar to typical ordinary and necessary day-to-day business expenses, the deductibility under IRC Section 162 of contributions to organizations with 501(c)(4) tax exempt status *hinges on the direct relationship between the expense and the taxpayer's business, as well as the reasonableness of the expenditure*." (see p. 3 of Form 886A)

I agree with you that this indeed is the *legal* basis for analyzing whether or not an expense is ordinary and necessary, however, the *facts* relied upon for making this decision were not the relevant facts for this inquiry. In spite of prior submissions that may or may not have been helpful to you in making your determination, I strongly believe that the expenses at issue are indeed deductible based upon facts that have not been previously focused upon and by themselves warrant a "no change" to the returns at issue. If you too evaluate this case with a fresh look, you will see that based upon these facts and relevant case law the expenses are indeed deductible as "ordinary and necessary" business expenses.

One of the concerns that you raise in your correspondence is that there is no direct nexus between Steuben Foods and EMPact.  This is not the case.  Steuben Foods has been at the forefront, in its patents and production, of *packaging food products that need no refrigeration and have a long shelf life which is important in disaster preparedness*.  (See attached document re: Patents).  Its aseptic processing and packaging allows nutritious low-acid products, including diary, to last for long periods of time in the event of a power failure.  It is no coincidence that at the events presented by EMPact, Steuben Foods as well as other sponsors are involved in disaster preparedness, including the American Red Cross, Emergency Planning Committees, and the Scouts whose motto is "Be Prepared." (See sponsors listed in attached articles as highlighted.) Anyone who has seen even a snippet of "Doomsday Preppers" is aware of how these type of non-perishable products are valuable for those purposes. Those of us on the East coast who experienced Hurricane Sandy and the lengthy power outages know full well the benefits of having non-perishable food items readily available.

672093-10

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Internal Revenue Service
October 30, 2014
Page 3

It may seem unconventional to some observers that Mr. Schwartz seeks to protect his company from an EMP, but looking at it objectively, it is *precisely due to this belief* that he has placed an emphasis at Steuben Foods on *producing products that do not need refrigeration and have a long shelf life*.  By the very nature of this *patented packaging known as "aseptic low acid" technology* and through disaster preparedness events sponsored by Steuben and by EMPact, Steuben has received tremendous exposure for its products. For these reasons alone their expenditures are directly related to the products they make and sell.  Their involvement in EMPact just creates more buzz about the company and interest in these very same products.  The targeted audiences of EMPact are exactly those who will purchase the products Steuben manufactures. (See attached American Preparedness Blog where Steuben Foods is mentioned.) Other sponsors of these events also receive the same type of name recognition.

Attached are just some examples that are highlighted of how its products and its involvement in disaster preparedness have become widely known, so there is a direct relationship between its expenditures and its business purpose. Has Steuben's commitment and expenditures related to disaster preparedness improved its name recognition? Yes.  Has it generated business related to the fact that consumers seek the long shelf life products it manufactures? Yes.  Its "aseptic low acid" products have gained popularity and notoriety.  I guarantee that any "doomsday prepper" or even your average consumer who may prepare less wholeheartedly for a real or imagined pending disaster has products in their pantries that are made by Steuben foods.

Analogies are often helpful in illustrating a point.  A simple way of looking at this would be if a manufacturer of Hazmat suits, protective gloves and goggles was the sponsor for symposiums on Ebola and made contributions to a non-profit organization dedicated to that cause. Their involvement would result in the name recognition for their products and certainly sales for hazmat gear would be generated.  Their expenditures in this context would no doubt be considered as ordinary and necessary business expenses as it "creates a financial return in the way of increased sales and the expansion of its market" (see page 6 of Form 886A).  There is a nexus in this example.

Another relevant analogy would be if a manufacturer of solar energy or wind energy was a sponsor or contributor to a non-profit organization that addressed climate change.  Similarly, they would be getting exposure for the products they sell and inevitably would generate sales because of their involvement with the organization, its events, and its activities. The perceived offbeat message of EMPact may cloud your thinking as to whether Steuben's involvement is relatable, but in the context of the apt analogies above, the relationship is more clear.  Had Ebola not taken hold of the headlines recently, long ago you may have thought a Hazmat suit manufacturer sponsoring an Ebola conference was also offbeat.  Again, there is a similar nexus in this example.

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Internal Revenue Service
October 30, 2014
Page 4

## LAW

I.R.C.§162 generally allows a deduction for ordinary and necessary business expenses. The deductibility of an expense is a question of fact. *See Commissioner v. Heininger*, 320 U.S. 467, 475 (1943). A deduction is ordinary if it bears a reasonably proximate relationship to the taxpayer's business. *Gill v. Commissioner*, T.C. Memo. 1994-92, affd. without published opinion 76 F.3d 378 (6th Cir. 1996). An expense is necessary if it is "helpful and appropriate in promoting and maintaining the taxpayer's business." *Carbine v. Commissioner*, 83 T.C. 356, 363 (1984).

With regard to advertising and event sponsorship at issue here, **an activity involving the display or frequent announcement of the taxpayer's trade or business name in an environment known or reasonably expected to attract potential business contacts strongly supports the conclusion that the expenses of that activity are deductible.** *See Hestnes v. Commissioner*, 47 T.C.M. 528 (1983), *aff'd in unpub. opin.* (7th Cir. 1985), *cert. denied*, 474 U.S. 904 (1985). A contribution to a fund raising organization is deductible as advertising (see PLR 9828031), as are a life insurance company's payments under a charitable giving program that it organized and under which it pays a specified amount to a charitable or civic organization designated by the policy owner because the company expects to receive additional sales and increased renewals from the program (see PLR 200236027).

The advertising must be directed toward those constituting the taxpayer's market or business environment. *U.S. Equip. Co. v. Commissioner*, 22 T.C.M. 1309 (1963). The cost of advertising the trade name of the taxpayer's trade or business is deductible under I.R.C. §162. *Ebner v. Commissioner*, 17 T.C.M. 550 (1958). The cost of promoting use of the taxpayer's product, through advertising and allowances, is deductible. *Rev. Rul.* 68-561, 1968-2 C.B. 117, distinguished by *Rev. Rul.* 69-331, 1969-1 C.B. 87. Specifically in the case of event sponsorship, if the sponsorship of a racing event, or an entry therein, **generates publicity for the taxpayer's trade or business that is beneficial,** the cost of the sponsorship is deductible under §162. Thus, absence of any reference to the taxpayer's trade or business at the sponsored event precludes the deduction. *Lang Chevrolet Co. v. Commissioner*, 26 T.C.M.1054 (1967). In our case, the name of Steuben Foods is ubiquitous in all of the sponsorship materials that we have attached, giving Steuben tremendous exposure and name recognition in the market it serves while promoting the necessity of long-shelf life products that need no refrigeration.

Deductions have been allowed for taxpayers when the sponsorships related to the taxpayers' businesses. See *Lang Chevrolet Co. v. Commissioner*, 26 T.C.M. 1054 (1967); see *Hestnes v. Commissioner*, 47 T.C.M. 528 (1983), *aff'd in unpub. opin.* (7th Cir. 4/11/85), *cert. denied*, 474 U.S. 904 (1985). In the case of *Hoffman v. Commissioner*, 19 T.C.M. 836 (1960), *aff'd on other issues*, 298 F.2d 784 (3d Cir.1962), the Tax Court held that costs incurred by a manufacturer of weight lifting equipment and publisher of health magazines for taking himself, employees, and sponsored athletes to the Olympics were deductible as advertising expenses

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Internal Revenue Service
October 30, 2014
Page 5

because sales were made at the games and magazine material was obtained. *Id.* at 849. Clearly the expenditures of Steuben Foods via event sponsorship and other activity exposed it to a market its products serve.

IRS Publication 535 states that "cash payments to an organization, charitable or otherwise, may be deductible as business expenses if the payments are not charitable contributions or gifts and are directly related to the taxpayer's business." The publication lists two examples to highlight this concept:

> "Example. You paid $15 to a local church for a halfpage ad in a program for a concert it is sponsoring. *The purpose of the ad was to encourage readers to buy your products.* Your payment is not a charitable contribution. *You can deduct it as an advertising expense.*

> Example. *You made a $100,000 donation to a committee organized by the local Chamber of Commerce to bring a convention to your city, intended to increase business activity, including yours.* Your payment is not a charitable contribution. *You can deduct it as a business expense.*" (Emphasis added.)

Similar to these above examples, the taxpayer's payments to the 501(c)(4) organization EMPact was as a sponsor for various events and educational activities, which gave it name recognition and exposure for its aseptic food products to a target audience.

In the case of *Ciaravella v. Commissioner*, T.C. Memo 1998-31 (1998), the IRS allowed a taxpayer who owned a business selling and leasing airplanes to deduct the cost of his race car expenditures as an ordinary and necessary cost of his airplane business. In this case, the taxpayer raced cars that were *emblazoned with his company's logo and his company's name was always announced* along with his own name at these races. The taxpayer argued, and the IRS agreed, that the race car *gave his business national exposure*. Further, the taxpayer argued that he met prominent people who may be interested in purchasing airplanes at these races. Because the taxpayers name and company were announced at each race, there was a logo on the car, and the marketplace of race car spectators and airplane purchasers were similar, the IRS held that the race car expenses were ordinary and necessary expenditures in the airplane business.

Notably, the stronger the connection is between the sponsorship and the taxpayer's business, the more likely that the full cost of sponsorship will be deductible. In this regard, in *Ciaravella*, the Tax Court found that the full cost of the race car sponsorship was deductible because of the strong "connection between the excitement and appeal of racing cars and owning and flying in high performance jet aircraft[s]." T.C. Memo 1998-31 (1998).

672093-10

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Internal Revenue Service
October 30, 2014
Page 6

Like the taxpayer in *Ciaravella* and the above-referenced cases and examples, the connection is strong between the Steuben's sponsorship and its business: (a) its manufacture of products that need no refrigeration and have a long shelf life are of interest to those interested in preparing for a doomsday scenario, exactly the type of audience that is the target of the EMPact organization; (b) the expenses incurred promoted the need for long-shelf life products needing no refrigeration which is part of its trade or business, resulting in a tremendous amount of exposure and hence an economic benefit through the manufacture and sale of aseptic products; (c) customers choose the taxpayer over their competitors in large part due to its commitment to preparedness and security which is evidenced by their involvement with EMPact; (d) as discussed more fully below, they are able to attract and retain excellent employees which provides a significant economic benefit to the company due to their involvement with EMPact.

Additional issues you have raised are as follows: (1) You state that expenditures were made on a regular basis and this taints deductibility. However, this is not a valid characterization. If those funds were used in sponsorship of conventions or other educational activities as a sponsor, whether they are paid in installments or in one payment is not relevant if the use of those funds is related to an ordinary and necessary business purpose. For example, if a convention is planned for a later date, a sponsor can begin making payments for that purpose in advance and in any manner they see fit, as long as they are used for that purpose. If the expense itself is deductible as a matter of fact and law, it doesn't matter how and when it is disbursed in this scenario; (2) You state that the products sold are often through indirect sales. Again, this is not a valid point. Whether or not Steuben is the direct or indirect producer of these products, the buzz that is generated within the disaster preparedness community triggers an increase in demand and hence increased purchases of aseptic products overall. These increased sales indeed benefit Steuben economically, whether these increased sales are through direct consumers or indirectly through third party producers who use Steuben's patented products via their brand names.

As noted above, the taxpayer has also reaped an economic benefit by its ability to attract and retain excellent employees due to its sponsorship activities. Its focus on preparedness and protection (especially of its employees and their families) has become part of its corporate culture. The taxpayer's involvement with EMPact, which provides disaster preparedness training and other benefits to the local community, demonstrates to its employees who live in that area how dedicated their employer is to their protection and welfare. This provides a direct economic benefit to the company. (Employee statements previously provided support this added economic benefit.)

As further evidence of all of the above, Mr. Schwartz has himself written a letter that details the company's history of which he is very proud and highlights the very essence of how the taxpayer's contributions to EMPact have directly impacted the success of Steuben Foods.

672093-10

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP
Internal Revenue Service
October 30, 2014
Page 7


Their involvement has provided a tremendous amount of name recognition for its product lines and thus the expenditures at issue are strongly related to its business of producing aseptic products.

### REQUEST FOR RELIEF

We contend based upon all of the above that the business expenses are indeed fully deductible as "ordinary and necessary" business expenses. We therefore respectfully request that you reconsider your position with regard to the deductibility of the expenses at issue. Please call me to discuss the above upon your receipt of this letter. I look forward to discussing the matter with you further in order to resolve this case. Thank you.


Sincerely,

Laurie B. Kazenoff, Esq.


LBK:Rfm
Attachments: As stated.


672093-10